COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-05-387-CV

 

 

JOHN L. HAWKINS AND                                                                       

RISCHON DEVELOPMENT CORP.                                          APPELLANTS

 

                                                   V.

 

RON WALKER AND MARLA WALKER                                       APPELLEES

 

                                              ------------

 

            FROM
THE 48TH DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

                                           I. Introduction








Rischon Development
Corporation and John L. Hawkins (collectively, appellants) appeal the trial
court=s August 15, 2005 judgment for Ron and Marla Walker.  In addition, appellants attempt to appeal a
November 13, 2006 order denying their post-judgment motion to recuse the trial
judge.  We affirm the trial court=s August 2005 judgment in part and reverse and render in part.  We dismiss appellants= appeal of the order denying their motion to recuse for want of
jurisdiction.

                       II. Background Facts and Procedural History

On April 19, 2001, the
Walkers bought lot 30 of the Sapphire Enclave subdivision in Colleyville, Texas
from Rischon for $95,000.  The Sapphire
Enclave consisted of thirty-two lots, which Rischon was developing.  Hawkins was Rischon=s president.  At the time of the
purchase, Ron Walker owned Ron Walker Custom Homes, Inc.  He had been in the custom home building
business for over twenty years and had built between 300 and 400 houses.  The Walkers planned to construct a Aspec house@ on the lot
that they would live in while the home was on the market.  








Ron had first heard of the
Sapphire Enclave sometime in 2000.  He
was impressed by the brochure advertising the subdivision, which stated that it
was to be a gated community.  Later, Ron
received a copy of the Sapphire Enclave building restrictions and homeowner=s association covenants,[1]
which Hawkins had drafted.  Before the
Walkers purchased their lot, Ron and Hawkins talked often about the subdivision
and Hawkins=s plans for
it.  According to Ron, Hawkins made
numerous representations to him, both before and after the Walkers purchased
their lot and began building their house. 
Ron testified that he relied on these representations in deciding to
purchase the Walkers= lot and in
building a 5000-plus square-foot house that was valued (preconstruction) at
$896,000. 

After closing on their lot in
April 2001, the Walkers began construction on their house.  A month or six weeks later, no other homes
were under construction, and no other lots had been sold.  In the summer of 2001, Hawkins told Ron that
he was considering selling the remaining lots in the Sapphire Enclave to Pulte
Homes and letting Pulte finish the subdivision. 
By this time, the Walkers had already finished the outside of their home
and had ordered custom items such as trim molding and cabinets.  Ron was concerned that the Walkers= home would be too expensive to be competitive with the lower-priced
homes that Pulte would build.  He was
also concerned because the promised gate and perimeter fence had not been
constructed and the subdivision was overgrown with weeds three to four feet
tall.  Consequently, the Walkers decided
to delay finishing their house until they could see what type and price ranges
of houses would be built around theirs. 








Ron also asked Hawkins to
approve variances from the Covenants for the Walkers= home that would reduce construction costs, such as substituting a
heavy-duty composite roof for a slate one, a six-foot fence for an eight-foot
one, and aluminum windows for wood windows on the back of the house.  Hawkins verbally approved these
requests.  In addition, in violation of
the Covenants and without Hawkins=s approval, the Walkers used cedar siding on part of the house and
some nonconforming doors and shutters. 
They also did not install roof down spout drains hidden within the house=s exterior walls, as required by the Covenants.  As a result of these cost-saving measures,
the Walkers= total cost
in their finished house was $732,199. 

In early 2002, Rischon
revoked the Covenants and sold the remaining thirty-one lots in the Sapphire
Enclave to Pulte.  Pulte cleaned up the
subdivision and began building other homes. 
Pulte put up a sign advertising the homes as starting at $300,000 to
$400,000. 








In early January 2003, the
Walkers consented to Rischon=s revocation of the Covenants. 
On January 23, 2003, the Walkers sold their house for $490,000.  Shirley McLemore, a real estate agent with
more than twenty years= experience
who had worked with the Walkers on the design and layout of their house,
testified at trial that the Walkers= house should have sold for $850,000 to $900,000, but it did not
because no homes of similar value were built in the Sapphire Enclave.  McLemore further testified that potential
buyers did not like the subdivision because the Walkers= home was the only one under construction, and people were concerned
that the surrounding lots, as well as the subdivision entrance, were unkempt
and covered in tall weeds. 

Meanwhile, in December 2001,
the Walkers sued appellants,[2]
alleging causes of action for statutory fraud under business and commerce code
section 27.01, common law fraud, and negligent misrepresentations.  The Walkers also sought declaratory relief
and statutory damages from Rischon for its alleged invalid revocation of the
Covenants under property code section 202.004. 


Rischon counterclaimed for a
declaratory judgment that the Covenants were revocable and properly revoked by
Rischon, and that the Walkers had not complied with the Covenants and,
therefore, could not enforce them. 
Rischon sought actual damages and attorney=s fees.








In August 2004, the trial
court granted the Walkers summary judgment on their claim that Rischon=s revocation of the Covenants was invalid.  In September and October 2004, the remainder
of the case was tried to a jury.  The
jury found that appellants had not committed common law fraud, but had
committed statutory fraud and negligent misrepresentations, resulting in
damages to the Walkers of $242,199.  The
jury also found that $25,000 in exemplary damages should be assessed against
both Rischon and Hawkins and that the Walkers= reasonable and necessary attorney=s fees were as follows: $45,000 through trial, $25,000 if the case was
appealed to this court, $15,000 if a petition for review is filed in the
Supreme Court of Texas, and $15,000 if the petition is granted. 

As to Rischon=s counterclaim for declaratory judgment, the jury found that the
Walkers had failed to comply with three out of eight Covenants without Hawkins=s approval[3]
but that Rischon had not suffered any damages or incurred any attorney=s fees as a result of the noncompliance.








The trial court rendered
judgment on the verdict and awarded the Walkers $242,199 in actual damages
against appellants, jointly and severally, pre- and post-judgment interest,
$25,000 in punitive damages against Hawkins, $25,000 in punitive damages
against Rischon, and attorney=s fees in the amounts found by the jury.  The trial court also awarded the Walkers
$68,600 in statutory damages against Rischon under section 202.004 of the
property code, less a settlement credit of $45,000.  The trial court did not award Rischon any
damages or attorney=s fees on
its counterclaim against the Walkers, but it recited that the Walkers had Afailed to comply with the restrictive covenants at issue without
justification as to the wood siding, wooden doors, and shutters on the
residence.@ 

After this appeal was filed
in this court, the Walkers contested appellants= affidavits of net worth filed to support their supersedeas bond, as
permitted by appellate rule 24.[4]  Following a hearing on the supersedeas bond
issue held on October 17, 2006, appellants filed a motion to recuse the trial
judge, the Honorable David Evans, alleging that Judge Evans=s conduct at the October 17 hearing called his impartiality into
question and violated the code of judicial conduct.  In response, the Walkers asserted that the
motion to recuse was groundless and moved for sanctions against
appellants.  In accordance with
procedural rule 18a, Judge Evans forwarded the recusal matter to the Honorable
Jeff Walker, the presiding judge of the Eighth Administrative Judicial Region
of Texas.[5]  After a hearing, Judge Walker denied the
motion to recuse and assessed sanctions against appellants.  Appellants are now attempting to appeal the
order denying their motion to recuse. 
The supersedeas issue remains pending in the trial court.[6]   








                             III. Property Code Section 202.004








In their first issue, appellants
complain that the trial court improperly rendered judgment awarding the Walkers
damages from Rischon under property code section 202.004 based on Rischon=s invalid revocation of the Covenants, because the Walkers, as private
landowners, are not entitled to relief under this statute.  Section 202.004 of the property code,
which is entitled AEnforcement of Restrictive Covenants,@ provides that A[a] property
owners= association or
other representative designated by an owner of real property may initiate,
defend, or intervene in litigation . . . affecting the enforcement of a
restrictive covenant or the protection, preservation, or operation of the
property covered by the dedicatory instrument.@[7]  A property owners= association is Aan
incorporated or unincorporated association owned by or whose members consist
primarily of the owners of the property covered by the dedicatory instrument
and through which the owners . . . manage or regulate the residential
subdivision.@[8]   In a suit brought under
section 202.004, a court may assess civil damages for the violation of a
restrictive covenant in an amount not to exceed $200 for each day of the
violation.[9]

The Walkers contend that
appellants have waived their complaint that the 
Walkers are not entitled to recover under section 202.004 because they
did not object when the Walkers asked the trial court to instruct the jury of
the court=s summary
judgment ruling that Rischon=s revocation of the Covenants was invalid.  We disagree. 
Appellants argued in their motion for judgment notwithstanding the
verdict that the Walkers could not recover statutory damages under section
202.004 because the statute applies only to homeowners= associations or owners= representatives and cannot benefit private landowners.  A challenge to the availability of a
statutory remedy in a post-verdict motion is sufficient to preserve the
complaint for appellate review.[10]  Accordingly, appellants have preserved this
complaint for our review, and we will address it.








In construing section 202.004
to determine whether the Walkers have standing to recover against Rischon as
private landowners, our goal is to give effect to the legislature=s intent.[11]  Unless a statute is ambiguous,[12]
we discern that intent from the language of the statute itself.[13]  A statutory provision will not be construed
to lead to an absurd result if the provision is subject to another more
reasonable interpretation.[14]
Further, we consider the provisions of a statute as a whole and not in
isolation.[15]








Section 202.004 expressly
provides that a Aproperty
owners= association or other representative designated by an owner of real
property@ may sue to enforce a restrictive covenant or to protect property
covered by a restrictive covenant.[16]  This exclusive language evidences a
legislative intent that only property owners= associations or the designated representative of a property owner may
sue for civil damages under the statute. 
Individual property owners are not identified in the statute as persons
or entities who are authorized to bring suit under the statute.[17]  

In this case, the Walkers are
not, and do not purport to be, a property owners= association as that term is statutorily defined.  Nor is there any evidence in the record
showing that they are designated representatives of the property owners in the
Sapphire Enclave.[18]  Instead, they sued Rischon in their
individual capacities.  Because section
202.004 does not authorize the Walkers 
to sue and recover damages in their individual capacity, they are not
entitled to recover from Rischon under the statute.  Therefore, we sustain appellants= first issue.[19]








                                       IV.
Statutory Fraud

In their
tenth, twelfth, and fourteenth issues, appellants challenge the legal and
factual sufficiency of the evidence to support the jury=s statutory fraud findings under section 27.01 of the business and
commerce code.

                                    A.
Standards of Review








A legal sufficiency challenge may be
sustained only when: (1) the record discloses a complete absence of evidence of
a vital fact; (2) the court is barred by rules of law or of evidence from
giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a mere scintilla; or (4)
the evidence establishes conclusively the opposite of a vital fact.[20]  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could, and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.[21]  Anything more than a scintilla of evidence is
legally sufficient to support the finding.[22]  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.[23]

An assertion that the
evidence is factually insufficient to support a fact finding means that the
evidence supporting the finding is so weak or the evidence to the contrary is
so overwhelming that the answer should be set aside and a new trial ordered.[24]  We are required to consider all of the
evidence in the case in making this determination, not just the evidence that
supports the finding.[25]

                                B.
Elements of Statutory Fraud








A plaintiff
may recover for statutory fraud in a real estate transaction under section
27.01 of the business and commerce code by establishing the following: (1) the
defendant made a false, material promise to do an act, (2) with the intention
of not fulfilling it, (3) for the purpose of inducing the plaintiff to enter
into a contract, and (4) the plaintiff relied on the promise in entering into
the contract.[26]  A plaintiff who proves these elements is
entitled to recover from the defendant actual and exemplary damages.[27]


Although a party=s intent to defraud is determined at the time the party made the
representation, it may be inferred from the party=s subsequent acts following the representation.[28]  Failure to perform, standing alone, is not
sufficient evidence of the promisor=s intent not to perform when the promise was made.[29]  That fact is, however, a circumstance to be
considered with other facts to establish intent.[30]  Intent is a fact question uniquely within the
realm of the trier of fact because it so depends upon the credibility of the
witnesses and the weight to be given their testimony.[31]  ASlight circumstantial evidence@ of fraud, when considered with the breach of a promise to perform, is
sufficient to support a finding of fraudulent intent.[32]








An actionable representation
is one concerning a material fact; a pure expression of opinion will not
support an action for fraud.[33]  Whether a statement is an actionable
statement of Afact@ or merely one of Aopinion@ often
depends on the circumstances in which the statement is made.[34]  Among the relevant circumstances are the
statement=s
specificity, the comparative levels of the speaker=s and the hearer=s knowledge,
and whether the statement relates to the present or the future.[35]  








A person who makes a
misrepresentation is liable to the person or class of persons the maker intends
or has reason to expect will act in reliance upon the misrepresentation.[36]  If a defendant makes a misrepresentation
about property to a potential buyer in the presence of a third party and the
third party later acts on the misrepresentation to his detriment, the defendant
is not liable to the third party for fraud unless he intended to deceive the
third party or knew there was an Aespecial likelihood@ that his representation would influence the third party=s conduct.[37]

Texas recognizes two measures
of direct damages for fraud: the out‑of‑pocket measure and the
benefit‑of‑the‑bargain measure.[38]  The out‑of‑pocket measure
computes the difference between the value paid and the value received, while
the benefit‑of‑the‑bargain measure computes the difference
between the value as represented and the value received.[39]  Both of these measures of damages are
determined at the time of sale.[40]  In addition, to these damages, however, the
defrauded party is entitled to recover special damages for other pecuniary
losses proximately caused by the misrepresentation.[41]








1.     Hawkins
Made False Promises to Act with the Intention of Not Fulfilling Them to Induce
the Walkers to Purchase the Lot and Build their Home in Sapphire Enclave       

 

Ron testified that Hawkins made the following representations
regarding development of the Sapphire Enclave:

$The
subdivision would feature only Aworld class@
architecture. 

 

$Only Apreferred@
builders from Southlake and ColleyvilleCincluding Ron WalkerCwould
be permitted to build in the subdivision. 
Their names and telephone numbers were listed on a sign located at the
front of the subdivision.  

 

$Homes
in the Sapphire Enclave would be priced starting at $700,000, as stated on a
sign at the entrance to the subdivision. 

 

$The
subdivision entrance would be completed as represented in the brochure that the
Walkers had received, with neutral-colored brick columns and wrought iron. 

 

$A
fence would be constructed around the perimeter of the subdivision so that it
would be truly Agated.@ 

 

$Hawkins
would stay with the subdivision for as long as possible to make it
successful.  

The evidence shows that all
but the first of these representations constitute false material promises to
act that Hawkins made for the purpose of inducing the Walkers to purchase the
lot and build their home in the Sapphire Enclave.








Ron testified that Hawkins
specifically told himCboth before
and after the Walkers bought their lotCthat the subdivision entrance would be completed as represented in the
brochure that the Walkers had received, with neutral-colored brick columns,
wrought iron work, and completed landscaping, and that a fence would be
constructed around the entire perimeter of the subdivision so that it would be
truly Agated.@  Hawkins said work on the entrance and the
perimeter fencing would begin Aimmediately,@ as soon as
the Walkers closed on their property. 
Hawkins told Ron about another subdivision in Keller that Hawkins just
had begun developing and suggested that Ron look at it.  Ron went and looked at that subdivision and
saw that it was Avery nice.@  The Keller subdivision had a
perimeter wrought iron fence all the way around it, and the gate and
landscaping were completely finished.  








Hawkins did not begin work
immediately on the promised gate and perimeter fence, and the gate eventually
completed was not as represented. 
Instead of the promised neutral-colored brick columns and wrought iron
work, Hawkins had stucco arches put up that were an Aorangy pinkish@ color.  McLemore, the Walkers= realtor, testified that the neutral color depicted in appellants= brochure was common in Colleyville subdivisions but that the orangy
pinkish color appellants actually used was not, and her clients commented about
it.  McLemore further testified that,
when she asked Hawkins if the color could be changed, he responded that it Ahad been in his plan to have it that color and . . . that he thought
it was very pleasing.@[42]    

In addition, McLemore
testified that only a few flowers were planted by the entrance, rather than the
trees, shrubs, and extensive landscaping depicted in the brochure; the entrance
area was weedy and looked like it was not being cared for; part of the gate was
not constructed for a long time; and the wrought iron fencing was not in place.  Indeed, appellants never had the fence
constructed; Pulte built the fence after Pulte purchased the property in 2002.[43]       The
evidence further shows that the names and phone numbers of the Apreferred@ builders
whom Hawkins had represented would be allowed to build in the Sapphire Enclave
were listed on a sign at the front of the subdivision.  The $700,000-plus price range for the homes
that were to be built was also shown on the sign.  








Hawkins testified, however,
that none of these builders except Walker had committed to building homes in
Sapphire Enclave at the time Hawkins put their names on the sign, and that all
but the Walkers= lot had
been sold to Pulte, which was not on the preferred builders= list and built homes priced much lower than $700,000.  The builders simply allowed Hawkins to use
their names and telephone numbers in an attempt to generate business in the
subdivision.  Moreover, nothing in the
Covenants that Hawkins drafted allowed appellants to control which builders
would build homes in Sapphire Enclave.  

Ron testified that, when he
asked Hawkins about his long-range plan for the Sapphire Enclave in case the
lots did not sell quickly, Hawkins assured him that he was prepared to stay
with the subdivision as long as possible to get it going and make it
successful.  Hawkins reiterated this assurance
before the Walkers closed on their lot, in response to Ron=s expressed concern regarding the lack of closings or contracts on
other lots.  Hawkins, however, began
talking to Pulte about selling the Sapphire Enclave in the summer of 2001, only
three or four months after the Walkers had closed on their lot and begun work
on their house.    








Appellants contend that they
did not know until the Walkers closed on their lot that the Walkers, rather
than Ron=s company, would be purchasing the lot; therefore, appellants had no
reason to expect that the Walkers would rely on appellants= representations and thus did not intend to defraud them
individually.  Ron acknowledged that the
Walkers did not tell appellants until the closing on their lot that they,
rather than Ron Walker Custom Homes, Inc., would be purchasing the lot.  Hawkins knew, however, that Ron was
interested in purchasing a lot in the Sapphire Enclave in some capacity and
building a custom home on it, and Hawkins made the representations about the
subdivision directly to Ron in order to influence his decision.  Moreover, Marla testified that, before the
Walkers bought their lot, Hawkins and his wife took the Walkers and Gerri
Lowry, Rischon=s selling
agent, to dinner.  Marla testified they
talked about the subdivision at dinner and that Aeveryone was real excited.@ 

2.  The Walkers Relied on Hawkins=s False Promises

Ron testified that, at the
time the Walkers purchased their lot, he had been building custom homes for
over twenty years and had built between 300 and 400 houses.  He said that he relied on Hawkins=s representations regarding the Apreferred@ builders
list and the $700,000-plus price range in deciding to purchase the Walkers= lot and build a home with an estimated preconstruction value of
$896,000. 








Appellants contend that Ron
did not reasonably rely on Hawkins=s representation that only preferred builders would build homes in the
Sapphire Enclave because the Walkers contracted with Joe Willingham, who was
not on the preferred builders list, to build the Walkers= home.  Ron testified, however,
that Willingham was Marla=s father and
that his designation as the Walkers= builder on their loan construction agreement was a mere formality
suggested by the Walkers=
banker.  Ron testified that he, not
Willingham, built the Walkers= home.     

3.     The Walkers were Damaged by Appellants= Misrepresentation

Appellants
also challenge the sufficiency of the evidence to support the jury=s finding of $242,199 in actual damages on the Walkers= statutory fraud claim. 
Appellants argue that the Walkers could recover damages based only on
the value of their lot at the time they bought it from appellantsCnot based on the sale price of their completed homeCand that there is legally and factually insufficient evidence of the
value of the lot.  Appellants further
contend that there is no evidence supporting the damages award because the
evidence does not show that the sale price of the Walkers= completed home was impacted by appellants= failure to perform as represented. 








The evidence shows that, in
reliance on appellants=
misrepresentations regarding how the Sapphire Enclave would be developed, the
Walkers decided to build a home on their lot that was valued, before
construction, at just over $896,000.[44]  Ron testified that, subsequently, when no
other lots in the Sapphire Enclave had sold and he learned that appellants were
considering selling the subdivision to Pulte, he obtained approval from Hawkins
to make some substitutions in building materials that reduced the Walkers= construction costs in the home. 
Ron also admitted that he made other modifications without Hawkins=s prior consent.  Even with
these modifications, however, the Walkers= total cost to complete their home was $732,199.








In January 2003, the Walkers
sold their house for $490,000.  McLemore,
the Walkers= real estate
agent, who had more than twenty years= real estate experience in the Colleyville area, testified that the
Walkers= house should have sold for $850,000 to $900,000, but it did not
because no homes of similar value were built in the Sapphire Enclave.  McLemore further testified that potential
buyers did not like the color of the entrance to the subdivision.  She also testified that potential buyers did
not like subdivision itself because the Walkers= home was the only one under construction and the surrounding lots, as
well as the subdivision entrance, were unkempt and covered in tall weeds.  Ron testified that, based on the
representations Hawkins had made to him when he bought the lot, the Walkers= house, as it was eventually completed, should have sold for A[i]n the mid 800 range.@[45]  He further testified, however,
that he was seeking damages only for the difference between the sale price of
the house and his cost to build it. 








In summary, the evidence
shows that the Walkers built the home that they did in reliance on appellants= representations regarding how the Sapphire Enclave would be developed
and that the sale price of the Walkers= home was directly impacted by appellants= failure to perform as represented to Ron.  The jury found that the Walkers suffered
$242,199 in damages as a result of appellants= fraud, which was the difference between the sale price of the Walkers= house and their cost to complete it. 
In a fraud case, A[s]pecial
damages may be recovered for losses on improvements to property purchased as a
result of misrepresentation.@[46]  Accordingly, we hold that the
evidence is legally and factually sufficient to support the jury=s damages finding.  

Based on the foregoing, we
overrule appellants= tenth,
twelfth, and fourteenth issues.[47]








                                      C.  Statute of Frauds








In their
thirteenth issue, appellants contend that the Walkers= statutory fraud claim is barred by the statute of frauds.[48]  We disagree. 
A fraud claim is barred by the statute of frauds only when the plaintiff
seeks to obtain the benefit of the bargain that he would have obtained had the
defendant=s promise
been performed.[49]  In this case, the Walkers did not seek by
their fraud claim to obtain the benefit of an alleged bargain between
themselves and appellants.  Indeed, as
appellants point out, the trial court noted that the Walkers were not seeking Aexpectation damages,@ i.e., damages for the benefit of a bargain with appellants.[50]  Therefore, the statute of frauds does not
apply to their fraud claim.  We overrule
appellants= thirteenth
issue.

                                        V. Attorney=s Fees

                              A. Attorney=s Fees Through Trial








In their twentieth issue,
appellants challenge the legal and factual sufficiency of the evidence to
support the jury=s finding
that reasonable and necessary attorney=s fees for preparation and trial of the Walkers= case were $45,000.  A person
who violates section 27.01 by committing statutory fraud Ashall be liable to the person defrauded for reasonable and necessary
attorney=s fees@;[51]
therefore, the Walkers are entitled to recover reasonable attorney=s fees from appellants on their statutory fraud claim.  Accordingly, we will consider whether the
evidence is sufficient to support the jury=s finding.








The party seeking to recover
attorney=s fees bears the burden of proving that they are reasonable and
necessary.[52]  Factors that the factfinder should consider
when determining the reasonableness of a fee include: (1) the time and labor
required, the novelty and difficulty of the questions involved, and the skill
required to perform the legal service properly; (2) the likelihood that the
acceptance of the particular employment will preclude other employment by the
lawyer; (3) the fee customarily charged in the locality for similar legal
services; (4) the amount involved and the results obtained; (5) the time
limitations imposed by the client or by the circumstances; (6) the nature and
length of the professional relationship with the client; (7) the experience,
reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent on results obtained or uncertainty
of collection before the legal services have been rendered.[53]  The party seeking to recover attorney=s fees is not required to present evidence on all of these factors.[54]  Evidence of a fee agreement is insufficient,
by itself, to support a fee award.[55]  But evidence from an expert witness that the
fee arrangement at issue was the reasonable or usual and customary fee for the
type of litigation involved provides an evidentiary foundation upon which the
factfinder can calculate the award.[56]








In this case, the Walkers= attorney, Cecil Miskin, testified that he had been the Walkers= attorney for over fifteen years. 
Miskin testified that he and the Walkers had entered into a fee
agreement under which the Walkers agreed to pay a flat $15,000 fee for each of
three stages of the case: (1) the preliminary investigation and attempted
negotiations with appellants, (2) preparation for trial, and (3) trial of the
case to judgment.  Miskin testified that
he had spent time reviewing the documents that the Walkers provided when they
asked him to take their case, handling the initial investigation of the case,
writing a series of letters to Hawkins, corresponding with appellants= attorney, obtaining and reviewing Aa very significant quantity@ of discovery materials, deposing Hawkins, defending the Walkers= depositions, and responding to a long series of summary judgment
motions that were brought primarily by appellants.  The record shows that the trial itself lasted
three days.  Miskin opined that his fees
were very reasonable for an attorney of his skills and education.[57]  He testified that he did not keep time
records, but he estimated that he had spent well in excess of 200 hours working
on the case and testified that his hourly rate was $350 per hour.[58]

Miskin acknowledged that some
of the work he had performed on the case had pertained to the Walkers= lawsuit against Pulte, which had settled before trial.  This included preparing and filing an amended
pleading, taking a small deposition, preparing and responding to correspondence
between counsel, and negotiating a settlement agreement between the Walkers and
Pulte.  Miskin testified, however, that
this work was inextricably intertwined with and Asubstantially less@ than the work he had performed related to the Walkers= suit against appellants. 








Although appellants= counsel had the opportunity to cross-examine Miskin and to present
other witnesses, Miskin=s testimony
was uncontroverted.  Therefore, the jury
was entitled to accept it as true.[59]

Having carefully considered
the evidence regarding the reasonableness of Miskin=s attorney=s fees and
the lack of controverting evidence, we hold that the evidence is legally and
factually sufficient to support the award of $45,000 in attorney=s fees for preparation and trial of the Walkers= case.  Accordingly, we overrule
appellants= twentieth
issue.

                                     B.  Segregation of Fees








In their sixth through eighth
issues, appellants contend that the Walkers cannot recover attorney=s fees on their claim that appellants improperly revoked the
Covenants.  Ordinarily, a party seeking
to recover attorney=s fees is
required to segregate fees between claims for which he can recover attorney=s fees from claims for which he cannot.[60]  Appellants did not, however, timely object to
the trial court=s submission
of a broad attorney=s fees issue
to the jury, which asked, AWhat is a reasonable fee for the necessary services of [the Walkers=] attorney in this case . . . [f]or preparation and trial@?  Therefore, although we have
reversed the trial court=s judgment
for the Walkers on the improper revocation claim, appellants have waived their
right to complain on appeal that the Walkers must segregate the attorney=s fees awarded between that claim and their statutory fraud claim.[61]
Although appellants objected to the failure to segregate in their post-verdict
and post-judgment motions, these objections came too late to preserve this
complaint for our review.[62]  Therefore, we overrule appellants= sixth through eighth issues.

                                 C.  Appellate Attorney=s Fees













The jury also awarded the
Walkers the following appellate attorney=s fees: $25,000 if the case was appealed to this court, $15,000 if a
petition for review is filed in the Supreme Court of Texas, and an additional
$15,000 if the petition for review is granted. 
In their nineteenth issue, appellants challenge the legal sufficiency of
the evidence to support these findings regarding appellate attorney=s fees.  Appellants contend, and
the Walkers concede, that the Walkers did not offer any evidence at trial
regarding appellate attorney=s fees. Where, as here, the jury
is the factfinder, there must be competent evidence in the record to support
appellate attorney=s fees.[63]  The Walkers 
argue that, in rendering judgment for appellate attorney=s fees, the trial court was authorized under Section 38.004 of the
Texas Civil Practices and Remedies Code to take judicial notice of the usual
and customary appellate attorney=s fees and the contents of the case file without receiving any
evidence regarding fees.  We
disagree.  Section 38.004 applies only to
proceedings Abefore the
court@ or to jury trials Ain which the amount of attorney=s fees is submitted to the court by agreement.@[64]  Neither situation is present
here.  Accordingly, because there is no
evidence regarding appellate attorney=s fees, we hold that the evidence is legally insufficient to support
the award of appellate attorney=s fees.[65]  We sustain appellant=s nineteenth issue.

                       VI. Appellants= Declaratory Judgment Claim

In issues twenty-two through
twenty-four appellants complain about the trial court=s judgment on their counterclaim for declaratory judgment.  

Appellants first contend that
the trial court erred by not rendering a declaratory judgment that the Walkers
had failed to comply with the Covenants. 
The trial court, however, did render a judgment declaring that the
Walkers had failed to comply with three Covenants.  We, therefore, overrule issue twenty-two.

        In their twenty-third issue, appellants
challenge the sufficiency of the evidence to support the jury=s finding that Rischon did not suffer any damages as a result of the
Walkers= failure to comply with the three Covenants.  The evidence regarding Rischon=s damages is as follows:








Hawkins testified that,
around September 1, 2001, Pulte had made an initial offer to purchase the
thirty-one remaining lots in the Sapphire Enclave for $3,100,000 but that Pulte
had ultimately paid only $2,300,000 for the lots in early 2002.  Hawkins opined that the Abad condition@ of the
Walkers= unfinished home and its negative effect on the market contributed to
between 25 and 40% of the reduction in price.

Donald Dykstra, Pulte=s president, testified that the partial construction of the Walkers
home detracted Asomewhat@ from the appearance of the Sapphire Enclave.  Dykstra further testified, however, that
nothing the Walkers did influenced Pulte=s decision to purchase the lots or the price that Pulte paid for
them.  Dykstra testified that the sales
price was Acompletely
independent of the house or the restrictions@ and that the unfinished state of construction on the house Awasn=t a positive
factor on the subdivision, but it wasn=t an overriding concern either.@  In addition, McLemore
testified that, in her opinion as a real estate sales agent, the Walkers= unfinished house did not negatively affect the value of the adjoining
lots.  She explained that the home was Avery impressive from the front@ and Acertainly an
indication of what we had hoped the whole area was going to be.@








Having considered all of the
evidence, we hold that it is legally and factually sufficient to support the
jury=s finding that Rischon did not suffer any damages as a result of the
Walkers= failure to comply with the three Covenants.[66]  Although the evidence is conflicting, the
jury was free to believe Dykstra and McLemore and disbelieve Hawkins.[67]  Accordingly, we overrule appellants= twenty-third issue.

In their twenty-fourth issue,
appellants challenge the sufficiency of the evidence to support the jury=s finding of no reasonable attorney=s fees on appellants= counterclaim for declaratory judgment.  Appellants contend that, because Rischon
proved its attorney=s fees on
its counterclaim by uncontroverted evidence, Rischon is entitled to recover
those fees.  We disagree.








Rischon sought attorney=s fees under both section 37.009 of the declaratory judgments act and
section 5.006 of the property code.  In a
declaratory judgment proceeding, the decision whether to award attorney=s fees lies with the trial court.[68]  This determination is within the trial court=s sound discretion, and the trial court=s judgment will not be reversed on appeal absent a clear showing that
the court abused its discretion.[69]  A trial court abuses its discretion only when
it acts arbitrarily or capriciously, without reference to any guiding rules or
principles.[70]

Here, Rischon did put on
evidence of its attorney=s fees;
however, in light of the jury=s finding that the Walkers violated only three of the eight Covenants
sued upon, which appellants do not challenge, and the jury=s finding that Rischon did not suffer any damages as a result, which
is supported by legally and factually sufficient evidence, we hold that the
trial court did not abuse its discretion by failing to award Rischon attorney=s fees under section 37.009.[71]








Property code section 5.006
provides, AIn an action
based on breach of a restrictive covenant pertaining to real property, the
court shall allow to a prevailing party who asserted the action reasonable attorney=s fees in addition to the party=s costs and claim.@[72]  The statute does not define Aprevailing party@; however,
courts have construed this phrase to mean that the party must recover at least
some of the relief sought by its claim.[73]  In light of the jury=s finding that Rischon should not recover anything on its claim
against the Walkers, we hold that the trial court properly concluded that
Rischon was not a prevailing party entitled to recover damages under section
5.006.

For all of these reasons, we
overrule appellants=
twenty-fourth issue.








        VII. Appellants= Appeal from the Denial of Their Motion to Recuse

In a separately filed appeal, appellants complain of Judge Walker=s order denying their motion to recuse Judge Evans from the pending
post-judgment supersedeas proceedings and of Judge Walker=s related sanctions order.

An order denying a motion to recuse is an unappealable interlocutory
order.[74]  Specifically, rule 18a of the Texas Rules of
Civil Procedure provides that an order denying a motion to recuse may be
reviewed only Aon appeal
from the final judgment.@[75]  The rule does not address the
appealability of an order denying a motion to recuse that is filed after an
appeal is taken from a final judgment.








Appellants
contend that their appeal from the order denying the motion to recuse Judge
Evans from the post-judgment supersedeas proceedings is allowed under rule 18a
because appellants have also appealed the trial court=s final judgment.  Appellants= motion to recuse, however, does not complain of Judge Evans=s participation in any pre-appeal trial court proceedings affecting
the final judgment.  Instead, the motion
seeks to recuse Judge Evans from participating in post-judgment supersedeas
proceedings based on conduct at the October 2006 supersedeas hearing that
occurred after the appeal from the final judgment was filed.  Therefore, while appellants have appealed the
order denying the motion to recuse during the pendency of the appeal from the
final judgment, the order is not reviewable Aon appeal from the final judgment@ because it had no effect on the final judgment and was entered after
the appeal from the final judgment was filed.[76]









Further, appellants are not seeking
to have the order reviewed on appeal from a post-judgment order entered by
Judge Evans.  The supersedeas issue
remains pending before the trial court. 
Judge Evans has taken no action under appellate rule 24.3(a) to modify
the amount or type of security or to decide the sufficiency of the sureties,
and no party has contended that he has abused his discretion under rule
24.3(a).[77]  Absent such a ruling by Judge Evans,
appellants have no basis to complain that Judge Walker=s denial of their motion to recuse has caused them prejudice.[78]

We hold that the
post-judgment order denying appellants= motion to recuse may be reviewed by this court only upon the filing
of a motion under appellate rule 24.4 complaining of the trial court=s exercise of its discretion under rule 24.3(a).  Because Judge Walker=s order denying appellants= motion to recuse is an unappealable interlocutory order and
appellants have not brought a complaint under appellate rule 24.4 challenging
Judge Evans=s exercise
of his discretion under rule 24.3(a), we have no jurisdiction to review Judge
Walker=s order.[79]








                                   VIII.  Appellate Sanctions

In a
cross-point, the Walkers argue that appellants= appeal of the order denying their motion to recuse is frivolous, and
they seek damages under appellate rule 45.[80]  We must exercise our discretion to impose
rule 45 damages with prudence, caution, and only after careful consideration.[81]  Rule 45 damages will not be imposed unless
the record, viewed from the appellant=s point of view at the time the appeal was taken, clearly shows that
the appeal was brought only for delay and that the appellant had no reasonable
expectation of reversal.[82]








Because we have determined
that we have no jurisdiction to review the order denying appellants= motion to recuse, we have not reached the merits of appellants= complaints regarding the order and express no opinion regarding
same.  Accordingly, we deny the Walkers= request for sanctions.

                                          IX.
Conclusion








Having sustained appellants= first and nineteenth issues, we reverse the trial court=s judgment for the Walkers on their claim brought under section
202.004 of the property code and render judgment that the Walkers take nothing
on that claim.[83]  We also reverse the trial court=s award of appellate attorney=s fees and render judgment that the Walkers recover no appellate
attorney=s fees from appellants.  We
affirm the remainder of the trial court=s August 2005 judgment and dismiss for want of jurisdiction appellants= separately filed appeal from the order denying their motion to
recuse.

 

 

JOHN CAYCE

CHIEF JUSTICE

 

PANEL A: 
CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

 

DELIVERED:  July 5, 2007











[1]For
simplicity, in this opinion we refer to these restrictions and covenants as the
Covenants.





[2]The
Walkers also sued other individuals and entities who are not parties to this
appeal. 





[3]The
jury found that the Walkers had improperly used wood siding and noncompliant
doors and shutters on their house.





[4]See Tex. R. App. P. 24.2(c)(2).





[5]See Tex. R. Civ. P. 18a(c)B(d)
(setting out procedure for same).





[6]See Tex. R. App. P. 24.3(a) (providing
that, after the trial court=s plenary power expires, it
has continuing jurisdiction to order the amount and type of security, to decide
the sufficiency of sureties, and to modify the amount or type of security).





[7]Tex. Prop. Code Ann. '
202.004(b) (Vernon 2007).





[8]Id. '
202.001(2).





[9]Id. '
202.004(c).





[10]Wal‑Mart Stores, Inc. v.
McKenzie, 997
S.W.2d 278, 280 (Tex. 1999). 





[11]Cont=l
Cas. Co. v. Downs, 81 S.W.3d 803, 805 (Tex. 2002); Nat=l
Liab. & Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex.
2000).





[12]The
parties do not assert that section 202.004 is ambiguous.





[13]Downs, 81
S.W.3d at 805; see Tex. Gov=t Code Ann. '
311.011(a) (Vernon 2005) (AWords and phrases shall be
read in context and construed according to the rules of grammar and common
usage.@); id.
'
312.002(a) (providing that words shall be given their ordinary meaning).





[14]C
& H Nationwide, Inc. v. Thompson, 903 S.W.2d 315, 322 n.5
(Tex. 1994), abrogated on other grounds, Battaglia v. Alexander, 177
S.W.3d 893 (Tex. 2005); Sharp v. House of Lloyd, Inc., 815 S.W.2d 245,
249 (Tex. 1991).





[15]Helena
Chem. Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001).





[16]Tex. Prop. Code Ann. ''
202.001(1), 202.004(b).





[17]See
Quinn v. Harris, No. 03-98-00117-CV, 1999 WL 125470, at *7-8
(Tex. App.CAustin
March 11, 1999, pet. denied) (not designated for publication) (holding same).





[18]See,
e.g., Anderson v. New Prop. Owners= Ass=n of
Newport, Inc., 122 S.W.3d 378, 388 (Tex. App.CTexarkana
2003, pet. denied) (holding that an association designated by a subdivision
owner as the owner=s
representative could sue under 202.004 on the owner=s
behalf); Musgrave v. Brookhaven Lake Prop. Owners Ass=n, 990
S.W.2d 386, 394  (Tex. App.CTexarkana
1999, pet. denied) (holding that a voluntary homeowners=
association, which property owners had designated as their representative by a
show of hands, could sue under section 202.004).





[19]In
light of our holding with regard to appellants=
first issue, we need not consider their second through fifth, eighteenth,
twenty-first, and twenty-fifth through twenty-eighth issues.  See Tex.
R. App. P. 47.1 (providing that a court of appeals need address only
issues raised that are necessary to the final disposition of the appeal).





[20]Uniroyal Goodrich Tire Co. v.
Martinez, 977
S.W.2d 328, 334 (Tex. 1998), cert. denied, 526 U.S. 1040 (1999);
Robert W. Calvert, "No Evidence" and "Insufficient
Evidence" Points of Error, 38 TEX. L.
REV. 361, 362-63 (1960).





[21]City of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).





[22]Cont=l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch
v. Hornsby, 935 S.W.2d 114, 118 (Tex. 1996). 





[23]Rocor Int=l, Inc. v. Nat=l Union Fire Ins. Co., 77 S.W.3d 253, 262 (Tex. 2002).





[24]Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). 





[25]Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.), cert.
denied, 525 U.S. 1017 (1998).





[26]Tex. Bus. & Com. Code Ann. '
27.01(a)(2) (Vernon 2002).





[27]Id. '
27.01(b)B(c).





[28]Spoljaric
v. Percival Tours, Inc., 708 S.W.2d 432, 434 (Tex. 1986); IKON
Office Solutions, Inc. v. Eifert, 125 S.W.3d 113, 124 (Tex. App.CHouston
[14th Dist.] 2003, pet. denied).  





[29]Schindler
v. Austwell Farmers Co‑op., 841 S.W.2d 853, 854 (Tex.
1992); Spoljaric, 708 S.W.2d at 435.





[30]Schindler, 841
S.W.2d at 854; Spoljaric, 708 S.W.2d at 435.





[31]Spoljaric, 708
S.W.2d at 434.





[32]Id. at
435.





[33]Transport
Ins. Co. v. Faircloth, 898 S.W.2d 269, 276 (Tex. 1995).





[34]Id.





[35]Id.





[36]Ernst
& Young, L.L.P. v. Pac. Mut. Life Ins. Co., 51
S.W.3d 573, 578-79 (Tex. 2001).





[37]Id. at
578, 581; see Westcliff Co. v. Wall, 153 Tex. 271, 267 S.W.2d
544, 546 (1954) (holding that there was no evidence of the defendant=s
intent to defraud a third party because the defendant did not know when he made
the misrepresentations in the third party=s presence that the third
party was interested in purchasing the property).





[38]Formosa
Plastics Corp. USA  v. Presidio Eng=rs
and Contractors, Inc., 960 S.W.2d 41, 49 (Tex. 1998); Arthur
Andersen & Co. v. Perry Equip. Corp., 945 S.W.2d 812, 817 (Tex. 1997).





[39]Formosa
Plastics Corp., 960 S.W.2d at 49; Arthur Andersen & Co.,
945 S.W.2d at 817.





[40]Arthur
Andersen & Co., 945 S.W.2d at 817.





[41]Trenholm
v. Ratcliff, 646 S.W.2d 927, 933 (Tex. 1983); Bruce v. Jim
Walters Homes, Inc., 943 S.W.2d 121, 123 (Tex. App.CSan
Antonio 1997, writ denied); Airborne Freight Corp. v. C.R. Lee Enters.,
Inc., 847 S.W.2d 289, 295 (Tex. App.CEl Paso 1992, writ denied).





[42]Hawkins
testified that he and McLemore had never met or spoken to one another before
trial and that this testimony was untrue. 
As the trier of fact, however, the jury was free to believe McLemore=s
testimony and disbelieve Hawkins=s.  See McGalliard v. Kuhlmann, 722 S.W.2d
694, 697 (Tex. 1986) (holding that, when presented with conflicting evidence,
the trier of fact may believe one witness and disbelieve others).





[43]Appellants=
argument that Hawkins=s
representation regarding building a perimeter fence was not false because Pulte
built the fence is without merit.  Ron
testified that Hawkins represented that appellants, not another developer,
would have the fence built and that construction on the fence would begin
immediately after the Walkers closed on their lot. 





[44]Ron
Walker testified that the home the Walkers planned to build was A[i]n
the 800 range.@  John Marin, the certified real estate
appraiser who prepared the preconstruction appraisal for the Walkers=
home, testified that he had prepared the appraisal using the cost approach and
the direct sales comparison approach and had calculated that the value of the
home upon completion would be $896,600. 





[45]Marin
testified that his preconstruction appraised value of $896,600 was calculated
with the expectation that the house would be built as originally planned, not
with the substitutions of materials that later occurred.





[46]Trenholm, 646
S.W.2d at 933.  Appellants suggest that,
because the Walkers contracted in February 2001 (i.e., before they purchased
their lot) to purchase their home from Ron Walker=s
corporation for $585,000, that contract price is evidence that appellants are
not liable to the Walkers for any amount over $585,000 that the Walkers spent
to complete their home.  But the February
2001 contract was not admitted into evidence to establish the value of the
home.  Ron Walker testified that the
Walkers executed the contract as a formality so that they could obtain title to
the property and close on their construction loan.  Further, the jury was free to resolve
conflicts between this evidence and Ron=s, McLemore=s,
and Marin=s
testimony regarding the value of the completed home.  See McGalliard, 722 S.W.2d at 697.





[47]Because
we have held that the evidence is legally and factually sufficient to support
the jury=s
liability and damages findings on the Walkers=
statutory fraud claim, and that those findings support the trial court=s
judgment for $242,199 in actual damages, we need not consider appellants=
ninth, eleventh, and fifteenth  issues,
in which they challenge the sufficiency of the evidence to support the jury=s
liability and damages findings on the Walkers=
negligent misrepresentations claim.  See
Tex. R. App. P. 47.1 (providing
that a court of appeals need consider only issues raised that are necessary to
the final disposition of the appeal). 
Similarly, we also overrule appellant=s sixteenth and seventeenth
issues challenging the award for exemplary damages and attorney=s
fees based on the argument that there is insufficient evidence to support the
statutory fraud findings.





[48]See,
e.g., Tex. Bus. & Com. Code Ann.
'
26.01(a), (b)(4) (Vernon Supp. 2006) (providing that a promise or agreement in
a contract for the sale of real estate is not enforceable unless it is in
writing and signed by the party to be charged).





[49]Sonnichsen
v. Baylor Univ., 47 S.W.3d 122, 127 (Tex. App.CWaco
2001, no pet.); Leach v. Conoco, Inc., 892 S.W.2d 954, 960 (Tex. App.CHouston
[1st Dist.] 1995, writ dism=d w.o.j.)





[50]See
Sanchez v. Johnson & Johnson Med., Inc., 860 S.W.2d 503,
513-14 & n.4 (Tex. App.CEl Paso 1993) (noting that
expectation damages are benefit-of-the-bargain damages), aff=d in
part and rev=d in
part on other grounds, 924 S.W.2d 925 (Tex. 1996); Nance v.
Resolution Trust Corp., 803 S.W.2d 323, 330 n.3 (Tex. App.CSan
Antonio 1990) (same), writ denied, 813 S.W.2d 154 (Tex. 1991).  Collins v. Allied Pharmacy Mgmt., Inc.,
871 S.W.2d 929, 936 (Tex. App.CHouston [14th Dist.] 1994, no
writ), on which appellants rely, is inapposite. 
In that case, the plaintiffs sought by their fraud claim to enforce
alleged provisions in their employment agreements.  See id.





[51]See Tex. Bus. & Com. Code Ann. '
27.01(e).  Appellants=
complaint that the Walkers cannot recover attorney=s
fees on this claim is waived because appellants did not raise it in the trial
court.  See Tex. R. App. P. 33.1(a).  Indeed, in their motion for new trial,
appellants acknowledged that the Walkers could recover attorney=s
fees for statutory fraud. 





[52]Stewart
Title Guar. Co. v. Sterling, 822 S.W.2d 1, 10 (Tex.
1991), modified on other grounds by Tony Gullo Motors I, L.P. v.
Chapa, 212 S.W.3d 299 (Tex. 2006).





[53]Arthur
Andersen & Co., 945 S.W.2d at 818.





[54]Hagedorn
v. Tisdale, 73 S.W.3d 341, 353 (Tex. App.CAmarillo
2002, no pet.).





[55]Id.





[56]Liberty
Mut. Ins. Co. v. Allen, 669 S.W.2d 750, 755 (Tex. App.CHouston
[1st Dist.] 1983, writ ref=d n.r.e.).





[57]Miskin
testified that he had been licensed in Texas for twenty-three years, had
maintained a certification in residential real estate law for fifteen years,
had taught real estate law at the University of Texas at Arlington and lectured
to the legal community on real estate issues, and that 90 to 95 percent of his
practice involved real estate and commercial litigation.





[58]Miskin
testified that he had charged this hourly rate to one major client for the past
four-and-a-half years.





[59]See
Ragsdale v. Progressive Voters League, 801 S.W.2d 880, 882 (Tex.
1990) (holding that, where the testimony of an interested witness is clear,
positive and direct, and uncontradicted by any other witness, attendant
circumstances, or inaccuracies, it may be taken as trueCespecially
where the opposing party had the means and opportunity of disproving the
testimony but failed to do so); see also City of Keller, 168 S.W.3d at 827 (holding that, in
conducting a legal sufficiency
review, we must consider evidence favorable to the finding if a reasonable
factfinder could).





[60]Tony
Gullo Motors I, L.P., 212 S.W.3d at 313-14.





[61]See Matthews
v. Candlewood Builders, Inc., 685 S.W.2d 649, 650 (Tex. 1985) (holding that
the defendant must request a jury issue separately allocating fees for each
fee-bearing claim in order to complain on appeal of fees not associated with
the plaintiff=s
successful claim). 





[62]See
Osterberg v. Peca, 12 S.W.3d 31, 55 (Tex.) (A[I]f
the trial court has >to
resolve a legal issue before the jury could properly perform its fact‑finding
role[,] . . . a party must lodge an objection in time for the trial court to
make an appropriate ruling without having to order a new trial.=@)
(quoting Holland v. Wal‑Mart Stores, Inc., 1 S.W.3d 91, 94 (Tex.
1999)), cert. denied, 530 U.S. 1244 (2000).





[63]Great
Am. Reserve Ins. Co. v. Britton, 406 S.W.2d 901, 907 (Tex.
1966); see Aiello, 941 S.W.2d at 73 (holding that, when a case is tried
to a jury, A[t]he
award of appellate fees is a question of fact for the jury@).





[64]Tex. Civ. Prac. & Rem. Code Ann. '
38.004 (Vernon 1997); See Main Place Custom Homes, Inc. v. Honaker,
192 S.W.3d 604, 622 (Tex. App.CFort Worth 2006, pet.
denied); Lefton v. Griffith, 136 S.W.3d 271, 279-80 (Tex. App.CSan
Antonio 2004, no pet.).





[65]See Uniroyal Goodrich Tire Co., 977 S.W.2d at 334
(holding that a legal
sufficiency challenge must be sustained when the record discloses a complete
absence of evidence of a vital fact).





[66]See
id. (setting out legal sufficiency standard of review); Garza, 395
S.W.2d at 823 (setting out factual sufficiency standard of review).





[67]See
McGalliard, 722 S.W.2d at 697.





[68]See Tex. Civ. Prac. & Rem. Code Ann. '
37.009 (Vernon 1997) (AIn a
proceeding under this chapter, the court may award costs and reasonable and
necessary attorney=s
fees as are equitable and just.@).





[69]Bocquet
v. Herring, 972 S.W.2d 19, 21 (Tex. 1998); Cotten v.
Weatherford Bancshares, Inc., 187 S.W.3d 687, 709 (Tex. App.CFort
Worth 2006, pet. denied).





[70]Downer
v. Acquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex.
1985), cert. denied, 476 U.S. 1159 (1986).





[71]See
Brazoria County v. Tex. Comm=n on Envtl. Quality, 128
S.W.3d 728, 744 (Tex. App.CAustin 2004, no pet.)
(holding that the trial court did not abuse its discretion by refusing to award
attorney=s
fees to the nonprevailing party in a declaratory judgment case); Parts
Indus. Corp. v. A.V.A. Servs., Inc., 104 S.W.3d 671, 685  (Tex. App.CCorpus Christi 2003, no pet.)
(holding that trial court did not abuse its discretion by refusing to award
attorney=s
fees to the prevailing party in a declaratory judgment case).





[72]Tex. Prop. Code Ann. '
5.006(a) (Vernon 2004).





[73]See,
e.g., Jim Rutherford Inv., Inc. v. Terramar Beach Comty. Ass=n, 25
S.W.3d 845, 853 (Tex. App.CHouston [14th Dist.] 2000,
pet. denied) (holding that plaintiff was the prevailing party because it had
obtained permanent injunctive relief against the defendant); Gorman v.
Countrywood Prop. Owners Ass=n, 1
S.W.3d 915, 917  (Tex. App.CBeaumont
1999, pet. denied) (noting that plaintiff that obtained a judgment for
delinquent maintenance fees was entitled to recover attorney=s
fees); Briargrove Park Property Owners, Inc. v. Riner, 867 S.W.2d 58, 61
(Tex. App.CTexarkana
1993, writ denied) (same); City of Houston v. Muse, 788 S.W.2d 419, 424
(Tex. App.CHouston
[1st Dist.] 1990, no writ) (injunctive relief); Hanchett v. E. Sunnyside
Civic League, 696 S.W.2d 613, 615 (Tex. App.CHouston
[14th Dist.] 1985, writ ref=d n.r.e.) (trial court
entered order requiring property owner to remove his noncompliant house from
his lot); Finkelstein v. Southampton Civic Club, 675 S.W.2d 271, 273
(Tex. App.CHouston
[1st Dist.] 1984, writ ref=d n.r.e.) (injunctive
relief); Inwood N. Homeowners= Ass=n v.
Meier, 625 S.W.2d 742, 743-44 (Tex. Civ. App.CHouston
[1st Dist.] 1981, no writ) (same); Rankin v. Covington Oaks Condo. Owners
Ass=n, No.
04-04-00861-CV, 2005 WL 3161039, at *1, 5 (Tex. App.CSan
Antonio Nov. 23, 2005, no pet.) (mem. op.) (plaintiffs obtained a declaratory
judgment that they were entitled to make the changes to their homes that the
homeowners=
association had arbitrarily denied).





[74]In re
Estate of Trevino, 195 S.W.3d 223, 226 (Tex. App.CSan
Antonio 2006, no pet.) (op. on reh=g); see Lehmann v. Har‑Con
Corp., 39 S.W.3d 191, 195 & n.12 (Tex. 2001) (noting the well-settled
rule that appellate courts can review only final judgments and interlocutory
orders specifically made appealable by statute).





[75]Tex. R. Civ. P. 18a(f); In re Union Pac.
Res. Co., 969 S.W.2d 427, 428 (Tex. 1998) (orig. proceeding).  The rationale for this rule is that the
erroneous denial of a recusal motion is not fundamental error and does not void
or nullify the trial judge=s subsequent acts.  Union Pac. Res. Co., 969 S.W.2d at
428.  Thus, if the appellate court
determines that the trial judge should have been recused, the appellate court
can reverse the trial court=s judgment and remand for a
new trial before a different judge.  Id.





[76]Appellants=
reliance on Sun Exploration & Prod. Co. v. Jackson, 783 S.W.2d 202,
206 (Tex. 1989), Martin v. State, 876 S.W.2d 396, 397 (Tex. App.CFort
Worth 1994, no writ), and Keene Corp. v. Rogers, 863 S.W.2d 168, 171
(Tex. App.CTexarkana
1993, no writ) is misplaced.  Those cases
are inapposite because they pertain only to the deadline for filing a motion to
recuse that complains of trial court proceedings affecting the final judgment.





[77]Tex. R. App. P. 24.3; see Tex. R. App. P. 24.4 (providing that
the appellate court may review these matters on a party=s
motion).





[78]See Tex. R. App. P. 44.1(a) (providing that
no judgment may be reversed based on trial court error unless the error
probably caused the rendition of an improper judgment or prevented the
appellant from properly presenting its case on appeal); cf. Liljeberg v.
Health Servs. Acquisition Corp., 486 U.S. 847, 862, 108 S. Ct. 2194, 2203
(1988) (holding that a trial judge=s failure to disqualify
himself under 28 U.S.C. ' 455
is subject to a harm analysis); In re Continental Airlines Corp., 901
F.2d 1259, 1263 (5th Cir. 1990) (same), cert. denied, 506 U.S. 828
(1992).





[79]In
the alternative, appellants ask us to treat their appeal as a petition for writ
of mandamus.  It is well settled,
however, that mandamus is an improper vehicle for challenging an order denying
a motion to recuse because there is an adequate remedy for reviewing the denial
of a motion to recuse on appeal. Union Pac. Res. Co., 969 S.W.2d at 428;
accord In re Norman, 191 S.W.3d 858, 860 (Tex. App.CHouston
[14th Dist.] 2006, orig. proceeding); In re Lutz, 164 S.W.3d 721, 723-24
(Tex. App.CEl
Paso 2005, orig. proceeding); In re Lincoln, 114 S.W.3d 724, 726 (Tex.
App.CAustin
2003, orig. proceeding).  When, and if,
the trial court exercises its discretion under appellate rule 24.3(a),
appellants have an adequate remedy for reviewing the order denying their motion
to recuse; therefore, a petition for writ of mandamus would be improper.





[80]See Tex. R. App. P. 45.





[81]Duran
v. Resdoor Co., 977 S.W.2d 690, 693 (Tex. App.CFort
Worth 1998, pet. denied); Deaner v. Marchese, No. 02-03-00029-CV, 2004
WL 177480, at *1 (Tex. App.CFort Worth Jan. 29, 2004, no
pet.) (mem. op.).





[82]Smith
v. Brown, 51 S.W.3d 376, 381 (Tex. App.CHouston
[1st Dist.] 2001, pet. denied); Duran, 977 S.W.2d at 693; Bledsoe v.
Kuczek, No. 02-02-00255-CV, 2003 WL 21476204, at *4 (Tex. App.CFort
Worth June 26, 2003, no pet.).





[83]The
trial court awarded appellants a $45,000 settlement credit against the Walkers=
statutory damages for improper revocation of the Covenants under section
202.004.  Appellants do not argue on
appeal that the settlement credit should be offset against the Walkers=
damages for statutory fraud.  Therefore,
we do not apply the settlement credit to that damages award.